IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY WASHINGTON,<br><br>    Petitioner,<br><br>  vs.<br><br>T. FELKER,<br><br>    Respondent.<br>_____ / | C 06-7760 WHA (PR)<br><br>**DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set forth below the petition is **DENIED**.

**STATEMENT**

An Alameda County jury convicted petitioner on one count of attempted murder, *see* Cal. Penal Code 664, 187(a), one count of possessing cocaine base for sale, *see* Cal. Health & Safety Code 11351.5, and one count of transporting cocaine base, *see id.* at 11352(a). He was sentenced to state prison for thirty-two years and eight months.

The California Court of Appeal summarized the facts of the case as follows:

> In September 2000, appellant shot Vedontay Underwood in the foot following an argument. Underwood declined to identify appellant to authorities who were investigating the shooting. He preferred to "handle" the matter

himself "on the street." After the incident, Underwood learned that appellant planned to kill him. Underwood tried to stay away from appellant.

On May 22, 2001, appellant entered the Queen of Sheba Market in Oakland. Appellant had been inside the store many times previously and the clerk, Nassir Mohammed, knew him by the initials "BA." Appellant and Mohammed got into an argument over who would pay for some items. Appellant pointed a handgun at Mohammed and threatened to "pop [his] ass." Fortunately, appellant left the store without carrying out his threat. Mohammed notified the police and told them "BA" had threatened him with a gun.

On May 23, 2001, near midnight, Vedontay Underwood was riding his bicycle near the Fruitvale BART station in Oakland. Underwood was carrying a .32 caliber semi-automatic pistol in an inside pocket of his jacket. Underwood saw a BART police officer as he entered the station area, so he zipped up his jacket so the officer could not see the gun. Underwood also saw two men seated on a bench with their backs toward him. Underwood rode his bicycle next to the men. He recognized them as appellant and Nate Sowell. As Underwood rode past the men, Sowell jumped up and ran. Underwood looked back and saw appellant firing a handgun at him. The first shot hit Underwood in the back. Appellant then fled. Underwood threw his own gun into a trash can and called his grandmother and told her he had been shot. The shooting was witnessed by a BART station agent and BART police officer both of whom said they saw a young black man fire five shots at a bicyclist.

Underwood was taken to a hospital where doctors found a bullet lodged in his back. The doctors decided not to remove the bullet because of the potential danger involved in doing so.

BART Police Detective E. Timothy Parker interviewed Underwood while he was at the hospital. Underwood was reluctant to identify appellant as the shooter believing he would be "killed" if he "snitched." Eventually, however, Underwood told Parker that "BA" which stood for "baby ant" had shot him.

The following day, Detective Parker showed Underwood a photographic lineup that included several persons whose nicknames included the word "ant." Underwood said one person in the lineup "kind of looked like [the shooter]" but that he had longer hair than the actual shooter.

On June 5, 2001, Mohammed, the market store clerk, saw appellant seated in the back of a car. Mohammed contacted two police officers and told them he had just seen the man who had threatened him with a gun two weeks earlier. The officers stopped the car and approached appellant. As they did so, one of them saw a gun protruding from appellant's waistband. The officer placed appellant in handcuffs and retrieved the gun. It was a loaded .22 caliber automatic. The officer searched appellant. He found 33 individually wrapped plastic baggies of cocaine base in appellant's pants pocket.

The officers took appellant to the police station. Appellant waived his Miranda rights and agreed to speak with one of the officers. He admitted he was selling drugs and said that he carried the gun for protection.

On June 8, 2001, Detective Parker showed Underwood a second photographic lineup. Underwood identified appellant saying he was "150 percent sure" that appellant was the one who shot him.

Detective Parker interviewed Sowell on June 11, 2001. He said he met appellant on a BART train on the night of the shooting, that they rode together to the Fruitvale BART station, and that they shared a bench while Sowell waited for a ride. When the ride arrived, Sowell started walking toward the car. As he did so, he heard shots. Sowell did not know who fired the shots. Sowell said he was afraid Detective Parker might tell appellant that he had identified him and that he might be labeled a "snitch."

Based on these facts, an information was filed charging appellant with the offenses we have set forth above.

Before the case could come to trial, Underwood started receiving threats. Appellant's cousin told Underwood to change his story and to say he "didn't see anything." When Underwood ignored the command and testified at the preliminary hearing, the cousin looked at Underwood and shook his head. Later the cousin saw Underwood in the neighborhood. He told him to "forget" appellant's next court date. Underwood also received threats from other people in his neighborhood. The threats were so bad, Underwood told his grandmother he was a "walking dead man[.]"

Underwood braved the threats and testified at trial. He identified appellant as the man who shot him on the night in question. Sowell, however changed his story. Testifying at trial, he denied he rode a BART train with appellant or that he was with him at the Fruitvale BART station. Sowell said he was sitting next to a different man that night.

Appellant testified and presented an alibi defense. He said he was at home on the night of the shooting. Appellant admitted, however, that he was selling cocaine base on June 5, 2001, and that he had a gun for protection.

The jurors considering this evidence convicted appellant on all three counts. In May 2002, the court sentenced appellant to 32 years, 8 months in prison.

(Exh. 6 at 1-4).

**DISCUSSION**

**A.   STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong

3

applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

4

**B.    ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner asserts that: (1) he received ineffective assistance of counsel at trial; (2) a juror committed misconduct by sleeping during portions of the testimony and jury instructions; and (3) the trial court failed to instruct the jury on the lesser-included offense of attempted voluntary manslaughter.

### 1.    Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner first must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Ibid.*

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697.

Petitioner contends that counsel was ineffective in failing to (a) move to suppress the testimony of Sowell and Underwood as fabricated and because it differed from what they told the investigating officers, and to suppress the testimony of Sowell because he was "pressured;" (b) "challenge the imposition of sentence on attempted murder, the use of a firearm, and great bodily injury, as being a violation of Penal Code 654 against multiple punishment;" (c) "challenge or request that the court use its power under Penal Code 1385(a) to impose sentence

5

1  on petitioner for the lesser serious offense and stay imposition of sentence on the more serious
2  offense;" (d) "challenge the fact that petitioner's arrest, prosecution and conviction is based
3  upon suspicion and/or insufficient circumstantial evidence to convict;" (e) "file a Penal Code
4  1538.5 to suppress the identification of petitioner as being a person involved in the crimes;" (f)
5  "research the facts of the case;" (g) "research the applicable law;" (h) "file a Penal Code 995
6  Motion to dismiss the charges on the grounds of lack of evidence to proceed against him;" and
7  (i) "offer any mitigating factual evidence on petitioner's behalf during sentenc[ing]."

Claims (f) and (g) in the petition do not state facts that point to a 'real possibility of constitutional error,'" Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970), nor does petitioner do so in his traverse. Those claims are without merit.

In claim (a), petitioner contends that counsel should have moved to suppress the testimony of Sowell and Underwood as "fabricated," and to suppress the testimony of Sowell on grounds he was "pressured." There is no exclusionary rule requiring suppression of a witness's testimony on grounds it is false, nor is there an exclusionary rule application to witness's testimony that allegedly is the product of coercion, when the witness is not the defendant. Dealing with such issues is what trials are for; whether the testimony was fabricated or the product of coercion was for the jury to determine. It thus would have been futile for counsel to make the motions petitioner suggests, and counsel was not ineffective in failing to make them. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion).

In claim (b), petitioner contends that counsel should have challenged his being given enhancements for both use of a firearm and infliction of great bodily injury, on grounds that doing so violated a state law provision, California Penal Code Section 654, which bars imposition of more than one sentence for offenses that involved a single act or arose out of an indivisible course of conduct. California courts are split on whether Section 654 applies to enhancements generally. *Compare People v. Palmore*, 79 Cal. App. 4th 1290, 1298 (2000) (Section 654 inapplicable), *and People v. Warinner*, Cal. App. 3d 1352, 1366 (1988) (same),

6

*with People v. Reeves*, 91 Cal. App. 4th 14, 55-56 (2001) (Section 654 applicable), *and People v. Arndt*, 76 Cal. App. 4th 387, 394-397 (1999) (same). But the California Supreme Court, although declining to decide the general question, has held that the enhancement for personally and intentionally discharging a firearm provided in California Penal Code Section 12022.53(c) – one of the enhancement imposed here – is not subject to Section 654. *See People v. Palacios*, 41 Cal. 4th 720, 727-28 (2007). As a result, petitioner here did not receive multiple enhancements in the sense meant by Section 654, as only one of the enhancements is subject to that section. It thus would have been futile for counsel to make the motion petitioner suggests, and counsel was not ineffective in failing to make it. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion).

In claim (c), petitioner contends that counsel was ineffective in not asking the sentencing court to "impose sentence on petitioner for the lesser serious offense and stay imposition of sentence on the more serious offense" under California Penal Code 1385(a). Section 1385(a) provides: "[t]he judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading." First, Section 1385(a) does not provide for a defense motion, but rather contemplates action by the court *sua sponte* or on request by the prosecution. Secondly, petitioner provides no explanation why the sentencing court would have entertained such a request. He has failed to show that counsel's failure to do so was deficient performance or that he was prejudiced.

In claim (d), petitioner counsel "failed to challenge the fact that petitioner's arrest, prosecution and conviction is based upon suspicion and/or insufficient circumstantial evidence to convict." This contention is not supported by any explanation or factual allegations. Habeas petitioners are expected to state facts that point to a 'real possibility of constitutional error.'" Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970).

7

"Habeas petitions which appear on their face to be legally insufficient are subject to summary dismissal." *Calderon v. United States Dist. Court (Nicolaus)*, 98 F.3d 1102, 1108 (9th Cir. 1996) (Schroeder, J., concurring). In this claim petitioner has failed to meet this standard, so no relief can be granted on this claim. Alternatively, the trial court's denial of petitioner's motion to suppress evidence on grounds he was illegally detained shows that an attempt to directly challenge the arrest would have been futile, and the evidence summarized in the lengthy quotation above from the opinion of the court of appeal was more than sufficient to support the conviction.

In claim (e), petitioner contends that counsel should have filed "a Penal Code 1538.5 to suppress the identification of petitioner as being a person involved in the crimes." In fact, counsel *did* move to suppress the identifications as the product of unduly suggestive procedures (RT (11/5/01) 109). This claim is without merit.

Claims (f) and (g) have been determined above to be legally insufficient, and thus are not grounds for relief.

In claim (h), petitioner contends that counsel was ineffective in failing to "file a Penal Code 995 Motion to dismiss the charges on the grounds of lack of evidence to proceed against him." There was evidence at the preliminary hearing that as Underwood rode his bicycle past petitioner on the BART platform, petitioner shot him in the back (CT 24-25, 29, 32). Underwood positively identified petitioner, who he knew from other incidents (CT 28, 36-38, 59). There was also evidence that when the police stopped petitioner's car, they found a loaded gun and thirty-three individually-wrapped rocks of cocaine (CT 72-76). Petitioner admitted intending to sell the cocaine (CT 77-78). Because this was more than sufficient evidence to proceed against petitioner for the charged offenses of attempted murder, possessing cocaine base for sale, and transporting cocaine base, a motion to dismiss for lack of evidence would have failed. Counsel's failure to make the motion was not deficient performance and did not prejudice petitioner.

In petitioner's claim (i), he contends that counsel was ineffective in failing to "offer any mitigating factual evidence on petitioner's behalf during sentenc[ing]." Petitioner has not say

8

what mitigating evidence that counsel might have presented, so has not carried his burden to show deficient representation or prejudice.

None of petitioner's claims of ineffective assistance of counsel have merit. The rejections of these claims by the California courts were not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

**2.      Jury Misconduct**

Petitioner contends that a juror committed misconduct by sleeping during critical testimony and during the reading of the jury instructions. This claim was raised on direct appeal. The California Court of Appeal described the background:

> After the prosecutor completed a portion of her closing argument, defense counsel, outside the jury's presence, raised the possibility that one of the jurors might have been sleeping. The relevant colloquy is as follows:
>
> "[Defense counsel] During the court's instructions, my attention was called by my client to juror number one who tends to believe that she was dozing off. As I watched her, I could see her open her eyes, and she was awake at that point, but I kept her under observation, but she would close her eyes and not just-and seem to slump down and sink into the chair.
>
> "On one occasion, I saw a pen slip out of her hand or out of her notepad, and she appeared to wake up. On another occasion, she slumped down, and the pen or pencil slipped out, and she didn't pick it up. She eventually became alert again and eventually noticed that the pen was not in her hand and picked it up.
>
> "And it causes me concern that she was actually dozing off while the court is reading the instructions, and that's why I brought it to the court's attention.
>
> "During the argument, I don't know, the line of sight is such that I couldn't see her. [The Prosecutor ] was between me and juror number one. And I guess it sounds like she had a cough or something because of the court stopping for the glass of water.
>
> "[The Court] After you advised me at sidebar what you believed your observations revealed during [the prosecutor's] argument thus far, I have taken periodic notice of juror number one, and she did not appear to be dozing to me. But what I would propose to do-anybody who has practiced as a trial lawyer for a while knows that long instructions especially if a room is warm tends to run together.
>
> "What I would propose to do at this point is just tell the jurors without picking on juror number one, because I don't know if she was dozing or not dozing, because I was not watching the juror at that point, because I was not paying particular attention to juror number one, is remind them at the conclusion of the instruction or just before the final instructions that I'm aware that they do tend to get a bit repetitive and they tend to-the words run together, and that's why

9

1    they are provided with a written copy.  If they have any question, they should
2    revert to the written instructions which are provided as read.  Hopefully, that will
     cure any problem, if there is one.

3    "[Prosecutor] Can I just-I'm sorry.  Can I just add one little bit of my own
4    observation? I, too, have been watching the jurors during argument, and I did
     notice juror number one's eyes downward, but the way I am positioned, I also
5    have an angle view of her lap and of her pad, and I know that on several times
     when I noticed her eyes downward, I actually saw her looking at her pad on her
6    lap, flipping through pages, occasionally she was making notations.  It was, I
     think, one of those times that she was turning the page that she may have dropped the pen.

7    "Now, I don't know if those were the same times that [defense counsel]
8    observed or not.  But the portion that I observed juror number one, although her
     eyes were downward, [she] was certainly awake and alert.

9    "[The Court] Given the fact that it is a warm room and given the way that
10   the instructions are worded and the number of instructions in this case, quite,
     frankly, I could see that it would take some bit of willpower for a person to
11   remain awake during your arguments.  No reason for either one of them.  So I'm
     sure that you both will do your best to keep them alert."

12   The prosecutor and defense counsel completed their final arguments after
     this discussion.  Subsequently, the jurors rendered their verdict convicting
13   appellant on all three counts.

14   Nearly two months later, appellant filed a motion to obtain personal
     information about the jurors so he could investigate a possible motion for new
15   trial based on juror misconduct.  The court conducted a hearing on appellant's
     motion.  As is relevant here, two witnesses testified.  [FN1 Other witnesses also
16   testified at the hearing.  Appellant has not based his argument on that other
     testimony, so we will not describe it.]  The first, Tiffany Brooks, was appellant's
17   aunt.  She attended court on the day Sowell testified.  Brooks said she saw juror
     number one "nodding off" periodically for "three or four minutes" during the
18   testimony of one of the BART employees.  Brooks conceded, however, that she
     could not actually see whether the juror was sleeping or whether she was just
19   concentrating with her eyes closed.

20   Appellant also testified at the hearing.  He said that on the day his Aunt
     Brooks attended the trial, he saw juror number one sleeping during Sowell's
21   testimony, and during the testimony of one of the BART employees.  Appellant
     said juror number one leaned her head on her hand, caught herself, woke up, and
22   then dozed off again.

23   The court hearing this evidence granted appellant's motion in part and
     allowed defense counsel to contact several of the jurors.
24
     Defense counsel contacted the jurors but was unable to obtain any
25   supporting information.  Despite this, the defense still filed a motion for new
     trial.  The motion was supported by the following declaration from defense
26   counsel:

27   "During the course of trial, my attention was called to juror No. One,
     who appeared to nod off during testimony.  As I observed her, her head appeared
28   to slump, and then some time [later], she would suddenly sit up.  On one

10

occasion, as her head slumped, her pen slipped out of her hand and to the floor. She did not react for several minutes. Then she straightened up, and looked around for the pen. It was at this point that I brought the matter to the attention of the court.

"After the at bench discussion, and during my argument, the court indicated it observed actions that led it to suspect that the juror might have nodded off, and interrupted my argument with the comment that my client wished to speak to me."

The trial court conducted a hearing on appellant's motion for new trial. After hearing argument from counsel, the court denied the motion explaining its decision as follows:

"[T]he Court was obviously present as were both of you and Mr. Washington during the course of the [incidents] that we have been discussing here. I'm satisfied, based on the record that I've read and my own personal memory, which is also fading just as yours is, Mr. [defense counsel], that the issue was first raised during the course of [the prosecutor's] argument rather than during the testimony. It was addressed [at] side-bar at the opportunity that we had, and some slight record was made of it at that point, at least some record of what transpired and occurred.

"I agree with you, Mr. [defense counsel], you did put on two witnesses at the evidentiary hearing that discussed those persons both being in court, and the fact that they believed from their vantage point, which by the measurements taken in this court from the witness'[s] seat to the nearest spot on the rail beyond which all jurors sit is 26 feet, a distance further than us. They did indicate, however, that they thought-one of them thought juror No. 1 was nodding....

"It's interesting since those were persons affiliated with Mr. Washington, that attention was not drawn to that earlier, that is the time it occurred.

"I have some difficulty with the fact that those witnesses testified [correctly].... It seems to me that if a juror does doze, and I'm not saying this juror did, as soon as it was drawn to my attention I started making observations of my own. And I think I indicated that on the record, that the juror's head did fall as I've indicated. You might think I'm asleep up here some of the time too. My eyes sometimes close, but I'm listening. Like Judge Taber who we all have probably appeared before one time or another, and when I was appearing before her as an attorney[,] I was sure she was dozing and found out later that she was right on top of it and [she] was not.

"So I don't think there's sufficient cause basically [ ] to upset this jury's verdict. They deliberated well. The issue was fairly clear cut for them. It's not so much what happened, but-but was the defendant the person involved. Based on what-the totality of what I see here, I don't think it rises to the gravity of ordering a new trial, and the motion will be denied."

(Exh. 4-8).

The court of appeal held that "[t]he evidence [petitioner] presented fell far short of 'convincing proof' that Juror One was 'actually asleep' during a material point in the trial" (*id.*

11

1  at 9). The court also held that petitioner had not shown that the juror was asleep during
2  Sowell's testimony, applying the same "convincing proof" standard (*id.* at 10).

3  Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination
4  will not be overturned on factual grounds unless objectively unreasonable in light of the
5  evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. The evidence
6  that the juror was asleep was at best weak. When the instructions were being read, defense
7  counsel thought she was nodding off, whereas the judge and the prosecutor thought not; during
8  Sowell's testimony, only petitioner and his aunt, who was observing from a distance as a
9  spectator, thought the juror was sleeping. As the trial court pointed out, both petitioner and his
10 aunt were interested witnesses, and their failure to bring up the issue sooner, considering that
11 the question of the juror nodding off during the instructions had been brought up
12 contemporaneously, undermined their credibility. Given this record, the determinations on this
13 issue made by the California courts were not unreasonable, and petitioner thus is not entitled to
14 habeas relief on this issue.

### 3. Lesser Included Offenses

16 Petitioner contends that in addition to instructing on attempted murder, the trial court
17 should have instructed on the lesser included offense of attempted voluntary manslaughter.

18 Although the Supreme Court has held that a failure to instruct on a lesser-included
19 offense may be constitutional error in a capital case, *Beck v. Alabama*, 447 U.S. 625, 638
20 (1980), it has not extended this holding to non-capital cases. The Ninth Circuit accordingly has
21 held that the failure of a state trial court to instruct on lesser-included offenses in a non-capital
22 case does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th
23 Cir. 2000).

24 In *Solis* the Ninth Circuit did observe that a "defendant's right to adequate jury
25 instructions on his or her theory of the case might, in some cases, constitute an exception to the
26 general rule" that the failure of a state trial court to instruct on lesser-included offenses in a
27 non-capital case does not present a federal constitutional claim. *Id.* at 929 (citation omitted).
28 But here petitioner's theory of the case was mistaken identity – he testified that he was not even

12

in the BART station on the night of the shooting (RT 564-65, 600-01). Thus, even if it is assumed that failure to give instructions on a lesser-included offense might in some cases violate a defendant's constitutional right to present his or her theory of the case, the failure of the trial court here to give a *sua sponte* manslaughter instruction could not have violated that right, simply because petitioner's theory of the case was mistaken identity, not imperfect self-defense. The trial court's failure to instruct on the lesser-included offense did not violate petitioner's rights, so the state appellate courts' rejections of these claims were not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: October  2 , 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.06\WASHINGTON7760.RUL.wpd